# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| **ROBIN WILKEY,** | |
| **Plaintiff,** | **CASE NO.** |
| **v.** | |
| **MOWI ASA (FKA MARINE HARVEST ASA), MARINE HARVEST USA, LLC, MARINE HARVEST CANADA, INC., DUCKTRAP RIVER OF MAINE LLC, GRIEG SEAFOOD ASA, GRIEG SEAFOOD BC LTD., BREMNES SEASHORE AS, OCEAN QUALITY AS, OCEAN QUALITY NORTH AMERICA INC., OCEAN QUALITY USA INC., OCEAN QUALITY PREMIUM BRANDS, INC., SALMAR ASA, LEROY SEAFOOD GROUP ASA, LEROY SEAFOOD USA INC., AND SCOTTISH SEA FARMS LTD.,** | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

Plaintiff Robin Wilkey ("Plaintiff"), individually and on behalf of all others similarly situated (the "Classes," and collectively the "Class," as defined below), upon personal knowledge as to the facts pertaining to herself, and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages under the laws of the several States and Territories recognizing such a claim, and injunctive relief pursuant to the federal antitrust laws and demands a trial by jury on all matters so triable.

## NATURE OF ACTION

1. This lawsuit arises from unlawful coordination of the prices charged to indirect purchasers of farm-raised salmon and salmon products derived therefrom (such as salmon fillets or smoked salmon) which were sold by Defendants Mowi ASA (f/k/a Marine Harvest ASA), Marine Harvest USA, LLC, Marine Harvest Canada, Inc., Ducktrap River of Maine LLC, Grieg Seafood ASA, Grieg Seafood BC Ltd., Bremnes Seashore AS, Ocean Quality AS, Ocean Quality North America Inc., Ocean Quality USA Inc., Ocean Quality Premium Brands, Inc., SalMar ASA, Leroy Seafood Group ASA, Leroy Seafood USA Inc., and Scottish Sea Farms Ltd. and/or entities owned or controlled by them (collectively, "Defendants") between July 1, 2015 and the present in violation the antitrust and consumer protection laws of each state recognizing a right of action for indirect purchasers harmed by anticompetitive conduct, as set forth below. Plaintiff also seeks injunctive relief under the Clayton Act and Sherman Act.

2. The European Commission ("EC") recently confirmed "that on 19 February 2019 its officials carried out unannounced inspections in several Member States at the premises of several companies in the sector of farmed Atlantic salmon."[1]

3. The EC commenced its investigation by sending a letter in early February 2019 to the

---

[1] *See* http://europa.eu/rapid/press-release_STATEMENT-19-1310_en.htm (last accessed May 21, 2019).

world's dominant suppliers of farm-raised salmon and their affiliates, in which it explained that it had received information that the companies—the Defendants—are "participat[ing in] or have participated in anti-competitive agreements and/or concerted practices related to different ways of price coordination in order to sustain and possibly increase the prices for Norwegian salmon."[2]

4.      According to the EC, the Defendants are and have been engaging in the following conduct:

- Coordinating sales prices and exchanging commercially sensitive information;

- Agreeing to purchase production from other competitors when these other competitors sell at lower prices; and

- Applying a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts.

5.      Plaintiff seeks to represent a Class consisting of all persons and entities in the States or territories recognizing the right of indirect purchasers to recover for injuries caused by anticompetitive conduct (set forth below) who indirectly purchased farm-raised salmon or products derived therefrom, for end consumption and not for resale, from one or more Defendants and/or entities owned or controlled by them from July 1, 2015 to the present (the "Class Period"). Excluded from the Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

## JURISDICTION AND VENUE

6.      Plaintiff brings this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) seeking to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of

---

[2] *See* https://www.undercurrentnews.com/2019/02/21/norways-antitrust-regulator-eyes-salmon-price-fixing-probe-with-interest/ (last accessed May 21, 2019).

Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3).

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

8.    Plaintiff asserts a claim for damages for all indirect purchasers under the laws of the several States and Territories recognizing such a claim, as set forth below. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.  The Court further has jurisdiction pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claims are so related to the federal claim at the time this matter is brought that they form part of the same case or controversy. The Court further has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $5,000,000 for the Class-wide relief sought, there are more than one hundred members seeking Class-wide relief, and there are members who are citizens of different states than the Defendants.

9.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

## **PARTIES**

10.    Plaintiff Robin Wilkey is domiciled in Somerset County, Maine.  During the  Class Period, Plaintiff purchased farm-raised salmon and/or products derived therefrom indirectly,   for end consumption and not for resale, from one or more Defendants and/or entities owned or controlled by them and has suffered monetary loss as a result of the antitrust  violations alleged herein.

11.    Defendant Mowi ASA (fka Marine Harvest ASA) ("Mowi") is a Norwegian seafood company with operations in several countries around the world. It engages in the production,

3

processing, and sale of farmed salmon, the operations of which are focused in Norway, Scotland, British Columbia, Canada, the Faroe Islands, Ireland, and Chile. Mowi has a share of between 25% and 30% of the global salmon and trout market, making it the world's largest company in the sector. Mowi also owns a "value added processing" unit, which prepares and distributes a range of seafood products, and a number of smaller divisions. The company is headquartered at Sandviksboder, 77AB, 5035, Bergen, Norway. Mowi is listed on the Oslo Stock Exchange, where it is a constituent of the benchmark OBX Index.

12.    Marine Harvest USA, LLC ("Marine Harvest USA") is Florida limited liability company that maintains its principal place of business at 8550 N.W. 17th Street #105, Miami, Florida 33126. Marine Harvest USA, a wholly-owned subsidiary of Mowi, processes salmon in Florida and Texas and distributes it to wholesalers, retailers and others in Florida and elsewhere in the United States.

13.    Marine Harvest Canada, Inc. ("Marine Harvest Canada") is a foreign corporation and wholly-owned subsidiary of Mowi. Marine Harvest Canada processes salmon in British Columbia, Canada, and distributes salmon in Canada and the western United States. Marine Harvest Canada is headquartered at 1334 Island Highway, Suite 124, Campbell River, British Columbia, V9W 8C9, Canada.

14.    Defendant Ducktrap River of Maine LLC ("Ducktrap") is a Maine limited liability company and wholly-owned subsidiary of Mowi. Ducktrap sells processed salmon products, such as sliced smoked salmon, under a number of trade names, including Ducktrap and Kendall Brook. The company has its headquarters at 57 Little River Dr., Belfast, ME 04915.

15.    Defendant Grieg Seafood ASA ("Grieg") is a foreign corporation that describes itself as "one of the world's leading fish farming companies, specializing in [A]tlantic salmon";

4

Grieg's "farming facilities are in Norway, Canada and the United Kingdom."[3] The company is headquartered at C. Sundtsgate 17/19, 5004, Bergen, 5004, Norway. Grieg is listed on the Oslo Stock Exchange.

16.    Defendant Grieg Seafood BC Ltd. ("Grieg BC"), a foreign corporation and wholly-owned subsidiary of Grieg, is headquartered at 1180 Ironwood Street # 106, Campbell River, British Columbia, Canada, V9W 5P7. Grieg BC farms salmon on 22 sites in British Columbia. It is the owner of Skuna Bay, a branded salmon product that is marketed and sold throughout the United States. Indeed, in its 2018 Annual Report, Grieg states that "Skuna Bay has become the preferred salmon of choice for top chefs throughout North America . . . ."[4] It claims that its salmon has been served to the President of the United States.

17.    Defendant Bremnes Seashore AS is a foreign corporation headquartered at Oklandsvegen 90, N-5430 Bremnes, Norway ("Bremnes Seashore"). Bremnes Seashore is in the business of salmon-farming and has operations throughout Norway. Bremnes Seashore owns 40% of Ocean Quality AS and uses that entity to sell and distribute its product around the globe, including in the United States.[5]

18.    Defendant Ocean Quality AS ("OQ") is a foreign corporation engaged in the salmon distribution business, with its headquarters at Grieg-Gaarden, C. Sundtsgate 17/19, N-5004,

---

[3] *See* https://www.griegseafood.no/en/ (last accessed May 21, 2019).

[4] *See* http://grieg18.digirapport.no (last accessed May 21, 2019).

[5] *See* https://www.seashore.no/en/production/ ("We supply salmon around the globe through our sales companies Salmon Brands and Ocean Quality. If you travel to Tokyo, Sydney, Chicago, Paris or Bangkok, you can enjoy the taste of salmon from Bremnes Seashore.") (last accessed May 21, 2019); *see also* https://www.seafoodsource.com/news/supply-trade/ocean-quality-to-open-british-columbia-operations) ("Ocean Quality AS, in Bergen, Norway, is a sales company established and jointly owned by Bremnes Seashore AS (40 percent) and Grieg Seafood ASA (60 percent).") (last accessed May 21, 2019).

Bergen, Norway. Grieg owns 60% of the outstanding shares of OQ and controls its operations.[6] Bremnes Seashore owns the remaining 40% of OQ.

19.     Defendant Ocean Quality North America Inc. ("OQ NA"), a foreign corporation and wholly owned subsidiary of OQ, is headquartered at 4445 Lougheed Highway, 500, Burnaby, BC V5C0E4, Canada. OQ NA facilitates the distribution of farm-raised salmon produced by Grieg and its subsidiaries and Bremnes Seashore throughout the United States. OQ NA has a dedicated sales office headed by General Manager Dennis Bryant, whose direct telephone number bears a Dallas, Texas area code.[7]

20.     Defendant Ocean Quality USA Inc. ("OQ USA") is a Delaware corporation and wholly-owned subsidiary of OQ, with its principal place of business located at 1914 Skillman Street # 110-309, Dallas, Texas, 75206-8559. OQ USA distributes salmon products produced by Grieg and its subsidiaries and Bremnes Seashore throughout the United States.[8]

21.     Defendant Ocean Quality Premium Brands, Inc. ("OQ Premium Brands") is a Delaware corporation and wholly-owned subsidiary of OQ, headquartered at 4445 Lougheed Highway, 500, Burnaby, BC V5C0E4, Canada. OQ Premium Brands' business purpose, according to a December 7, 2018 filing with the California Secretary of State, is "MARKETING AND BRANDING." OQ Premium Brands distributes salmon products produced by Grieg and its subsidiaries and Bremnes Seashore throughout the United States.

---

[6] *See* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf, at 46 ("OQ sells the fish to Asia, Europe, the USA and Canada.") (last accessed May 21, 2019); *see also* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf, at 49 (last accessed May 21, 2019).

[7] *See* https://oceanquality.com/contact/ (last accessed May 21, 2019).

[8] *See* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf , at 75 ("Ocean Quality USA Inc. is domiciled in the USA.") (last accessed May 21, 2019).

22.     Defendant SalMar ASA ("SalMar") is a foreign corporation that describes itself as "one of the world's largest and most efficient producers of Atlantic salmon, and is vertically integrated along the entire value chain from broodfish, roe and smolt to harvesting, processing and sales."[9] The company is headquartered at Idustriveien 51, N7266, Kverva, Norway. SalMar is listed on the Oslo Stock Exchange.

23.     According to SalMar's website:

> SalMar has established a fully integrated system for farming, processing, sales and distribution of farmed salmon and is thus in control of the total value chain.
>
> The salmon that SalMar is producing is sold through an in-house salesforce and/ or through close partners.
>
> Proximity to markets and customers, direct or through partners is important to secure efficient use of a high-quality raw material that has been through a traceable and controlled production process.
>
> InnovaMar is the name of SalMar's new harvesting and processing facility in Frøya, central Norway. It aims to be the world's most innovative and efficient facility for the landing, harvesting and processing of farmed salmon. InnovaMar covers 17,500 m2 of floor space and comprises two departments (harvesting and processing). The facility has the capacity for all kinds of storage. Good internal logistics ensure safe and efficient handling of the products. The increased capacity affords a high level of flexibility with regard to organi[z]ing production and sales.
>
> SalMar produces a wide variety of fresh and frozen salmon products. The customer base is global and includes small and large importers/exporters, as well as larger processing companies and retail chains.[10]

---

[9] *See* SalMar 2017 Annual report, http://hugin.info/138695/R/2188425/846513.pdf, at 45 (last accessed May 21, 2019).

[10] *See* https://www.salmar.no/en/sales-distribution/ (last accessed May 21, 2019).

24.    SalMar sells directly to entities within the United States:

> SalMar had direct sales to around 50 different countries in
> 2017. SalMar's most important geographic market in 2017
> was Europe, with Poland, Lithuania and Sweden as the
> largest individual markets. The second largest market was
> Asia, with Vietnam, Japan and Singapore as the largest
> individual markets. After sales to Russia were blocked in
> 2014, North America has been the third largest market, with
> the USA as the largest individual market. SalMar
> experienced particularly strong growth in the American
> market in 2017.[11]

25.    Defendant Leroy Seafood Group ASA ("Leroy"), a foreign corporation, is a seafood production and distribution company. The company is the second largest salmon and trout farming company in the world and has fish farms in Hitra, Kristiansund, Tromsand Scotland (Shetland). The company is headquartered at Thormøhlens gate 51 B, 5006 Bergen, Norway. Leroy is listed on the Oslo Stock Exchange. The company has sales offices in the United States:

> Our main office is located in Bergen, but we have fishing
> vessels and fish farms in operation along the entire coast of
> Norway. We have production and packaging plants in
> Norway, Sweden, Denmark, Finland, France, the
> Netherlands, Portugal, Spain and Turkey. We also have sales
> offices in the USA, Japan and China.[12]

26.    Defendant Leroy Seafood USA Inc. ("Leroy USA"), a North Carolina corporation and wholly-owned subsidiary of Leroy, is the U.S. distribution subsidiary for Leroy's farm-raised salmon business. Leroy USA's principal place of business is located at 1289 Fordham Blvd., Suite 406, Chapel Hill, NC 27514.

27.    Defendant Scottish Sea Farms Ltd. ("Scottish Sea Farms"), a foreign corporation,

---

[11] *See* 2017 Annual Report, http://hugin.info/138695/R/2188425/846513.pdf, at 53 (last accessed May 21, 2019).

[12] *See* https://www.leroyseafood.com/en/about-us/about-leroy/ (last accessed May 21, 2019).

is an aquaculture company that engages in the farming and production of salmon. Scottish Sea Farms is the United Kingdom's second largest producer of farmed salmon.[13] The company sells its products to retailers in the United Kingdom, the United States, Europe and internationally. Scottish Sea Farms is a joint venture of Defendants SalMar and Leroy, and each owns a 50% interest in Scottish Sea Farms. The company is headquartered at Laurel House, Laurelhill Business Park, Stirling, FK7 9JQ, United Kingdom, 01786 44552.

28.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

29.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

30.     Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## I.      FACTUAL ALLEGATIONS

### A.      The European Commission Is Investigating Unexplained Price Increases In The Salmon Market

31.     On February 19, 2019, *Undercurrent News* reported that in early February the EC opened an antitrust investigation into the world's major producers of farm-raised salmon:

> According to the letter, the EC has 'received information - from different actors operating at different levels in the salmon market - alleging that Norwegian producers of farmed Atlantic salmon . . . participate or have participated in anti-competitive agreements and/or concerted practices related to different ways of price coordination in order to

---

[13]*See* SalMar 2017 Annual report, http://hugin.info/138695/R/2188425/846513.pdf, at 45 (last accessed May 21, 2019).

> sustain and possibly increase the prices for Norwegian salmon.'
>
> The letter, which was sent to producers at the start of February, states the Norwegian producers concerned have been allegedly:
>
> • Coordinating sales prices and exchanging commercially sensitive information;
>
> • Agreeing to purchase production from other competitors when these other competitors sell at lower prices; and
>
> • Applying a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for longterm contracts.

Based on the information the EC has, these alleged practices have been going on since "at least" November 2017 and "are presumably ongoing."[14]

32.    The EC also released the following statement on February 19, 2019:

> The European Commission can confirm that on 19 February 2019 its officials carried out unannounced inspections in several Member States at the premises of several companies in the sector of farmed Atlantic salmon.
>
> The Commission has concerns that the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union). The Commission officials were accompanied by their counterparts from the relevant national competition authorities.[15]

33.    According to an article in *Undercurrent News* dated February 19, 2019, Mowi, Grieg, and SalMar have all confirmed that they were the subject of EC raids:

---

[14] *See* https://www.undercurrentnews.com/2019/02/21/norways-antitrust-regulator-eyes-salmon-price-fixing-probe-with-interest/ (last accessed May 21, 2019).

[15] *See* http://europa.eu/rapid/press-release_STATEMENT-19-1310_en.htm (last accessed May 21, 2019).

> *Undercurrent* first reported the news earlier on Tuesday, then Mowi, Grieg Seafood and SalMar all confirmed raids on their operations in the UK. Mowi's spokesman said the company's plant in Rosyth, UK, was raided, but then also confirmed a plant in Lemmers, formerly Marine Harvest Sterk, was inspected.
>
> The Sterk plant, the only one the company owns in the Netherlands, is mainly specialized on coating whitefish, but also does some salmon, according to its website.[16]

34.     In a recently released annual report for 2018, Mowi disclosed:

> In February 2019, The European Commission carried out unannounced inspections at selected premises of several Norwegian salmon companies, including Mowi. The Commission was acting on concerns that the inspected companies may have violated EU antitrust rules.[17]

35.     On February 19, 2019, Grieg filed a notice with the Oslo Stock Exchange stating as follows:

> The European Commission DG (Director General) Competition has today performed an inspection at Grieg Seafood Shetland to explore potential anticompetitive behavior in the salmon industry.
>
> Grieg Seafood aims to be open, transparent and forthcoming and will provide all necessary information requested by the European Commission DG Competition in its investigation.[18]

36.     On February 20, 2019, Leroy filed a notice with the Oslo Stock Exchange stating as follows:

> EU's competition authorities (European Commission Director General Competition) ha[ve] conducted an

---

[16] *See* https://www.undercurrentnews.com/2019/02/19/mowi-dutch-plant-also-raided-as-ec-confirms-probe-of-alleged-salmon-cartel/ (last accessed May 21, 2019).

[17] *See* http://hugin.info/209/R/2239765/882920.pdf, at 216 (last accessed May 21, 2019).

[18] *See* https://www.griegseafood.no/inverstors/stock-exchange-filings/ (last accessed May 21, 2019).

> inspection at the premises of Scottish Sea Farms Ltd. a company owned 50% by Lerøy Seafood Group ASA (LSG). The purpose is, according to the competition authorities, to investigate accusations of anti-competitive cooperation in the salmon market. In connection with the inspection, the EU competition authorities ha[ve] also requested for information from the shareholders in Scottish Sea Farms Ltd.[19]

37.      Also on February 19, 2019, SalMar issued the following report to the Oslo Stock Exchange:

> On [the] 19th of February 2019 the European Commission Director General Competition performed an inspection at Scottish Sea Farms Ltd., in which SalMar ASA indirectly owns 50 per cent. SalMar is in constructive dialogue with the Commission in this regard.[20]

38.      The salmon market is susceptible to manipulation by the major salmon producers in Norway. As alleged further below, the industry is highly concentrated and the spot market for salmon in Oslo, Norway, is the most important benchmark for salmon prices around the globe.

39.      Salmon is sold on the spot market and through annual contracts. Only one percent (1%) of Norway's salmon production is sold on the spot market, but those spot prices set the baseline for longer term contract prices.[21]

40.      Since 2015, salmon buyers in Europe have complained that Norway's salmon producers, including Mowi, have been rigging the spot market by using subsidiary companies, including Mowi's Polish subsidiary, Morpol (a fish processor and distributor), to drive up the spot price. As the purchasing director of Graal S.A. ("Graal") (a Polish salmon processor), Alina Piasecka,

---

[19] *See* https://www.leroyseafood.com/en/investor/Stockexchangenotices/ (last accessed April 23, 2019).

[20] *See* https://newsweb.oslobors.no/message/470051 (last accessed May 21, 2019).

[21] *See* https://salmonbusiness.com/suempols-gm-does-not-believe-in-price-caps-in-the-second-half-of-2017/ (last accessed May 21, 2019).

has explained, "[w]e've seen examples of prices falling in the spot market, and exporters offering fish at increasingly lower prices." She continued, "[s]uddenly, 15 minutes later there are aren't fish available, and we find out that Morpol has purchased perhaps 60 truckloads." Graal's CEO, Boguslaw Kowalski, has explained: "[w]e are seeing that now and again they take advantage of Morpol to buy at higher prices than that charged by the market, to hike up prices."[22]

41.     In 2017, Stale Hoyem ("Hoyem"), general manager of Suempol Norway, one of the biggest smoked salmon producers in Poland and Europe, complained that "companies in Norway buy small quantities of salmon to raise the price for the rest of the players." Hoyem added that "[o]ne last thing that affects prices is that some of the major players choose to create their own purchasing departments buying a truckload here and a truckload there;" he was "suggesting this 'daily' practice is heavily influencing prices on the spot market."[23] Borge Prytz Larsen, purchasing director at Severnaya, which imports salmon into Russia, confirmed Hoyem's statement: "The big players buy fish, and they then use the price as indicators for other customers."[24]

42.     Defendants' pricing behavior changed at the start of the Class Period. Hoyem complains: "In the old days we could negotiate contracts. Producers looked at their cost and then they put on a surcharge of about NOK 1 (€0.11/$.13) to NOK 2 (€0.21/$.25) [per kilo]."[25]

43.     The foregoing are examples of complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors and made for no other

---

[22] *See* https://www.intrafish.com/news/751597/marine-harvest-accused-of-manipulating-polish-salmon-market (last accessed May 21, 2019).

[23] *See* https://www.intrafish.com/news/1330269/norwegian-salmon-giants-accused-of-price-manipulation (last accessed May 21, 2019).

[24] *Id.*

[25] *Id.*

discernible reason than collusion.

44.    As a result of the conspiracy, Defendants' prices—and profits—for salmon have been increasing steadily since mid-2015, as Mowi itself illustrates in this chart:[26]



45.    Defendants frequently—and falsely—asserted that cost increases justify their price increases, but their own data disproves that purported justification. For example, the following chart from Mowi indicates that the "cost in box" of producing salmon (per kilogram) has increased approximately half of one Euro (or less) during the Class Period, but prices have increased at a substantially faster rate:[27]

---

[26] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 32 (last accessed May 21, 2019).

[27] *See* http://hugin.info/209/R/2177429/840178.pdf at 246 (last accessed May 21, 2019).



46.     According to Mowi's 4Q 2018 financial disclosures:

> '2018 was a very good year for Mowi. Strong demand for salmon and high prices in all markets resulted in great earnings for the company. I am proud of all my colleagues who work hard to produce healthy and tasty seafood for consumers all over the world. They have all contributed to the strong results,' says CEO Alf-Helge Aarskog.[28]

47.     Mowi's 2017 Annual Report also confirmed that since the uptick in salmon pricing starting in 2015, its *operating profits* or "Operational EBIT"[29] (reported in Euros) have substantially increased—from 83 million Euros in 2015, to 184 million Euros in 2016, and 214 million Euros in 2017.[30]

48.     Grieg similarly reported that its EBIT per kg gutted weight of fish (in Norwegian Kroner) has increased during the course of the conspiracy. According to Grieg's 2017 Annual

---

[28] *See*  https://www.globenewswire.com/news-release/2019/02/13/1724309/0/en/Strong-results-for-Mowi-in-the-fourth-quarter-2018.html (last accessed May 21, 2019).

[29] "In accounting and finance, earnings before interest and taxes ("EBIT") is a measure of a firm's profit that includes all incomes and expenses (operating and non-operating) except interest expenses and income tax expenses." *See*  https://en.wikipedia.org/wiki/Earnings_before_interest_and_taxes (last accessed May 21, 2019).

[30] *See* http://hugin.info/209/R/2177429/840178.pdf, at 7 (last accessed May 21, 2019).

Report, its EBIT was 0.7 Kroners/kg in 2015, 18.0 Kroners/kg in 2016, and 14.4 Kroners/kg in 2017.[31] Grieg's Q4 2018 Quarterly Report reports an EBIT per kg (in Norwegian Kroner) of 14.72 for 2018.

49.    Leroy has also experienced substantial increases in EBIT/kg (measured in Norwegian Kroner), increasing from 8.8 Kroners in 2015 to 18.9 Kroners in 2016, and 23.6 Kroners in 2017.[32] In 2018, Leroy's EBIT/kg was 19.6.[33]

50.    Similarly, SalMar's EBIT has increased substantially. In 2015, its EBIT was 1404 million Norwegian Kroners. In 2016, its EBIT was 2432 million Kroners. In 2017, EBIT was 3162 million Kroners.[34] In 2018, its EBIT was 3460.8 million Kroners.[35]

51.    These price increases—and the Defendants' coordinated behavior that caused them—have come at the expense of Plaintiff and the Class, who have paid more for farm-raised salmon than they otherwise would have in the absence of collusion.

### B.    The United States Is A Substantial Market For Farm-Raised Salmon

52.    The United States is the second largest global market for salmon behind only the EU, as Mowi reports in the graphic reflected below:[36]

---

[31] *See* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf, at 8 (last accessed May 21, 2019).

[32] *See* https://www.leroyseafood.com/en/investor/reports-and-webcast/annual-report-2017/to-the-table/#anchor-article-key-figures (last accessed May 21, 2019).

[33] *See* https://www.leroyseafood.com/globalassets/02-documents/english/reports/quarterly-reports/q4-2018-report.pdf (last accessed May 21, 2019).

[34] *See* http://hugin.info/138695/R/2188425/846513.pdf, at 4 (last accessed May 21, 2019).

[35] *See* http://hugin.info/138695/R/2234948/879657.pdf (last accessed May 21, 2019).

[36] *See* http://hugin.info/209/R/2234685/879436.pdf (last accessed May 21, 2019).

## Global volume by market

| Markets | Estimated volumes Q4 2018 | Estimated volumes Q4 2017 | Compared to Q4 2017 Volume | Compared to Q4 2017 % | Est. volumes Q3 2018 | 12 month comparison LTM | 12 month comparison PTM | 12 month comparison % |
|---|---|---|---|---|---|---|---|---|
| EU | 274 900 | 268 100 | 6 800 ↑ | 2.5% | 247 600 | 955 700 | 921 200 | 3.7% |
| Russia | 24 300 | 23 200 | 1 100 ↑ | 4.7% | 22 000 | 87 200 | 69 800 | 24.9% |
| Other Europe | 22 900 | 24 500 | -1 600 ↓ | -6.5% | 20 200 | 81 900 | 79 500 | 3.0% |
| Total Europe | 322 100 | 315 800 | 6 300 ↑ | 2.0% | 289 800 | 1 124 800 | 1 070 500 | 5.1% |
| USA | 107 700 | 103 000 | 4 700 ↑ | 4.6% | 102 200 | 427 900 | 397 700 | 7.6% |
| Brazil | 24 000 | 21 800 | 2 200 ↑ | 10.1% | 21 600 | 89 400 | 79 900 | 11.9% |
| Other Americas | 38 600 | 31 000 | 7 600 ↑ | 24.5% | 29 500 | 122 700 | 108 300 | 13.3% |
| Total Americas | 170 300 | 155 800 | 14 500 ↑ | 9.3% | 153 300 | 640 000 | 585 900 | 9.2% |
| China / Hong Kong | 25 800 | 27 300 | -1 500 ↓ | -5.5% | 24 700 | 101 700 | 86 000 | 18.3% |
| Japan | 16 300 | 15 900 | 400 ↑ | 2.5% | 12 800 | 53 900 | 57 700 | -6.6% |
| South Korea / Taiwan | 15 600 | 12 100 | 3 500 ↑ | 28.9% | 12 700 | 56 000 | 45 500 | 23.1% |
| Other Asia | 22 200 | 21 400 | 800 ↑ | 3.7% | 15 100 | 73 100 | 83 500 | -12.5% |
| Total Asia | 79 900 | 76 700 | 3 200 ↑ | 4.2% | 65 300 | 284 700 | 272 700 | 4.4% |
| All other markets | 32 900 | 30 400 | 2 500 ↑ | 8.2% | 29 400 | 116 000 | 108 800 | 6.6% |
| Total | 605 200 | 578 700 | 26 500 ↑ | 4.6% | 537 800 | 2 165 500 | 2 037 900 | 6.3% |
| Inflow to US from Europe | 25 700 | 25 100 | 600 ↑ | 2.4% | 22 000 | 93 800 | 95 300 | -1.6% |
| Inflow to EU from Chile | 8 400 | 12 200 | -3 800 ↓ | -31.1% | 7 600 | 37 700 | 38 300 | -1.6% |

Source: Kontali

- Strong demand globally
- Europe: Increased consumption at higher prices
- US: Convenient and consumer friendly pre-packed products drive growth
- Asia: Increased consumption. Lack of available large sized fish and certain trade restrictions temporarily impacted consumption in China/Hong Kong

Page 26
Source: Kontali
Note: Atlantic Salmon (GWT), LTM: Last Twelve Months; PTM: Previous Twelve Months*

MOWI

53.     A December 12, 2018 article from the industry publication *Intrafish* further explains:

> Salmon import volumes into the United States through October rose 10.5 percent, reaching 272,676 metric tons, according to new figures released by the National Marine Fisheries Service (NMFS).
>
> The value of Atlantic salmon imports rose as well, by 9.5 percent, to reach $2.9 billion (€2.6 billion), up from $2.6 billion (€2.3 billion) during the same period last year.[37]

### C.     The Production Process For Farm-Raised Salmon

54.     Mowi has diagrammed the process for breeding and growing farm-raised salmon as follows:[38]

---

[37] *See* https://www.intrafish.com/marketplace/1654239/us-imports-of-fresh-salmon-fillets-spike (last accessed May 21, 2019).

[38] *See* https://www.mowi.com/product/seafood-value-chain/ (last accessed April 23, 2019).

17



The life cycle of salmon starts in freshwater and involves several stages before the young salmon (smolt) are ready for the sea.



**EGGS**
Fertilised eggs are kept in incubation tanks in fresh water. There are approximately 5,000 eggs per litre. The eggs hatch into tiny fish (alevins), which have a yolk sac that provides nutrition until they are large enough to feed themselves.

**PARR**
Once they weigh about six grams, the fish are moved to larger freshwater tanks or to an open net cage in a lake. The fish now develop into parr and once they weigh about 60–80 grams they're ready to move on to the smolt stage.



**SMOLT**
This stage is when the fish undergo a physiological change that enables them to move from fresh water to seawater and become young adult salmon. The smolts are kept in net pens in the sea until they mature into adult salmon.

**HARVEST**
After just over a year in the sea the fish will have reached market weight (4.5 to 5.5kg) and are then harvested – in a variety of ways depending on the region.

55.     A report commissioned by the European Union titled "Developing Innovative Market Orientated Prediction Toolbox to Strengthen the Economic Sustainability and Competitiveness of European Seafood on Local and Global markets" further depicts how salmon is processed[39]:

---

[39] *See* European Union's Horizon 2020 research and innovation program, "Deliverable No. 3.4 -Report on evaluation of industry dynamics opportunities and threats to industry."



**D.**   **The Structure And Characteristics Of The Market For Farm-Raised Salmon Supports The Existence Of A Conspiracy**

56.   The structure and other characteristics of the market for farm-raised salmon make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

**1.**   **Barriers To New Entry Are High**

57.   A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. The market for farming salmon has high barriers to entry.

58.   Mowi's 2018 Investor's Handbook notes that there are relatively few locations in the world that provide the right mix of oceanic conditions for salmon farming and a political environment willing to allow the practice. Moreover, even if new entry could occur in the right geographic location, no additional salmon supply could be brought on line in the short run:[40]

---

[40] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 26 (last accessed May 21, 2019).



04   **Salmon Supply**

4.3 Few coastlines feasible for salmon farming

The main coastal areas adopted for salmon farming are depicted on the above map. The coastlines are within certain latitude bands on the Northern and Southern Hemisphere.

A key condition is a temperature range between above zero and 18-20ºC. The optimal temperature range for salmon is between 8 and 14ºC.

Salmon farming also requires a certain current to allow a flow of water through the farm. The current must however be below a certain level to allow the fish to move freely around in the sites. Such conditions are typically found in waters protected by archipelagos and fjords and rule out several coastlines.

Certain biological parameters are also required to allow efficient production. The biological conditions vary significantly within the adopted areas and are prohibitive for certain other areas.

Political willingness to permit salmon farming and to regulate the industry is also required. Licence systems have been adopted in all areas where salmon farming is carried out.

59.     Mowi explains that "[i]n all salmon producing regions, the relevant authorities have a licensing regime in place. In order to operate a salmon farm, a license is the key prerequisite. The licenses constrain the maximum for each company and the industry as a whole."[41]

60.     Moreover, wild caught salmon cannot reasonably constrain prices for farm-raised

---

[41] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 69 (last accessed May 21, 2019).

salmon. National Public Radio summarized the breeding and cost advantages that farm-raised salmon have over wild caught salmon in an August 29, 2017 article:

> **Why Are Atlantic Salmon Raised In The Pacific Northwest?**
>
> Atlantic salmon are not native to the Pacific Northwest. For years, they have been bred to become easier to farm — they're more 'highly domesticated,' according to the Washington Department of Fish and Wildlife. Most commercial fish farms raise Atlantic salmon.
>
> The WDFW says Atlantic salmon is a 'favored species' to farm in cold marine waters because the species grows quickly and consistently, is resistant to disease, and is something people like to eat. Farmed Atlantic salmon are more docile than wild fish.
>
> Atlantic salmon also have been bred to more 'efficiently turn feed into flesh,' says Michael Rust, the science adviser for NOAA's office of aquaculture.
>
> What used to cost several dollars per pound to grow, worldwide, now costs about $1.25, Rust says. That makes for higher profits.
>
> In the U.S., Washington and Maine are the two largest Atlantic salmon producing states, but they're small beans compared to salmon farms in Canada, Norway and Chile. Atlantic salmon today, Rust says, probably grow twice as fast as when aquaculture first started. [42]

61.     Wild caught salmon is generally twice as expensive per pound as farm-raised salmon.

## 2.     Farm-Raised Salmon Is A Commodity Product And Prices Are Correlated Across the Globe

62.     Mowi explains that salmon production is a "commodity" business: "As in most

---

[42] *See* https://www.npr.org/sections/thesalt/2017/08/29/546803147/why-are-atlantic-salmon-being-farmed-in-the-northwest (last accessed May 21, 2019).

commodity industries, the producers of Atlantic salmon are experiencing large volatility in the price achieved for the product."[43] A report issued in 2018 by the European Union confirms this point:

> The output of most salmonid aquaculture, and Atlantic salmon in particular, is highly commoditi[z]ed *i.e.* there is little differentiation between farms and competition is based purely on price. These products, mostly head-on gutted fresh fish, serve as raw material for further processing. In that situation, large enterprises which can reduce costs of production through economies of scale and offer the lowest price, have a competitive advantage.[44]

Commodity products are fungible and consumers and other purchasers have a variety of supply options which makes raising prices by any one supplier difficult in the absence of a conspiracy.

63.     Furthermore, according to Grieg, salmon prices are linked across the globe, and the Defendants and others closely follow these prices: "[t]here are several reference prices for salmon available. In Norway, Fish Pool ASA provides historic price information as well as salmon derivative prices FCA Oslo. In the United States, Urner Barry provides reference prices for North American salmon in Seattle and Chilean salmon in Miami*. Market prices are correlated across regions*."[45] (Emphases added.)

64.     Mowi also recognizes that "price correlation across regional markets is generally strong for Atlantic salmon."[46] It further explains that arbitrage between regions is one of the factors

---

[43] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 33 (last accessed May 21, 2019).

[44] *See* European Union's Horizon 2020 research and innovation program, "Deliverable No. 3.4 -Report on evaluation of industry dynamics opportunities and threats to industry," at 4.

[45] *See* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf, at 40 (last accessed May 21, 2019).

[46] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 31 (last accessed May 21, 2019).

constraining prices for Atlantic salmon.[47]    Accordingly, price-fixing of salmon prices in one market will affect prices globally.

65.    In fact, Mowi tracks the correlation of salmon prices globally in the normal course of its business.[48] The company illustrates this graphically[49]:



66.    This point was also recognized in a 2016 report issued by the Oslo Fish Pool (a salmon financial contracts exchange) and DNB Foods & Seafood (which is part of Norway's

---

[47] *Id.* at 32.

[48] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 32 (last accessed May 21, 2019).

[49] *Id.* at 33.

largest financial services organization) titled "World market for salmon: pricing and currencies."[50]
The report pointed out that Norwegian farmed salmon gate prices are "strongly linked" and that
the collusion by Defendants on those Norwegian prices directly affected prices for farmed salmon
raised elsewhere pursuant to the "law of one price".[51]

    67.    Indeed, the 2016 report noted as follows on page 7:[52]



    68.    The 2016 report further elaborates on the economic principle of the "law of one
price" as it relates to the farm-raised salmon market in the Unites States:[53]

---

[50] *See* http://fishpool.eu/wp-content/uploads/2016/04/final-dag.pdf (last accessed May 21, 2019).

[51] As explained below, Mowi operates salmon farms in Chile, as well as Norway.

[52] *See* http://fishpool.eu/wp-content/uploads/2016/04/final-dag.pdf (last accessed May 21, 2019).

[53] *See id.*



### 3. Norwegian Companies Dominate The Production Of Farm-Raised Salmon And The Defendants Are The Largest Global Producers

69.   A January 3, 2018 article in _salmonbusiness.com_—an industry publication—tracks

Norway's dominance in the salmon industry:[54]

---

[54] _See_ https://salmonbusiness.com/norways-market-share-shrinking/ (last accessed May 21, 2019).



70.    Moreover, Norway's salmon industry is dominated by Defendants Mowi, Leroy, SalMar and Grieg. According to Mowi:[55]

---

[55] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 36 (last accessed May 21, 2019).

## 06   **Industry Structure**

### 6.1 Top 5-10 players of farmed Atlantic salmon

| | Top 10 - Norway | H.Q. | Top 5 - United Kingdom | H.Q. | Top 5 - North America | H.Q. | Top 10 - Chile | H.Q. |
|---|---|---|---|---|---|---|---|---|
| 1 | Marine Harvest | 210 200 | Marine Harvest | 60 200 | Cooke Aquaculture | 57 000 | Salmones Multiexport | 58 700 |
| 2 | Salmar | 135 200 | Scottish Seafarms | 31 000 | Marine Harvest | 39 400 | Cermaq** | 54 000 |
| 3 | Lerøy Seafood | 132 000 | The Scottish Salmon Co. | 25 300 | Cermaq** | 21 000 | Marine Harvest | 44 900 |
| 4 | Cermaq** | 48 000 | Cooke Aquaculture | 20 000 | Northern Harvest | 12 500 | Empresas Aquachile | 43 300 |
| 5 | Grieg Seafood | 40 900 | Grieg Seafood | 12 100 | Grieg Seafood | 9 600 | Pesquera Los Fiordos | 41 000 |
| 6 | Nova Sea | 40 700 | | | | | Australis Seafood | 39 100 |
| 7 | Nordlaks | 40 000 | | | | | Camanchaca | 30 800 |
| 8 | Norway Royal Salmon | 31 900 | | | | | Blumar | 27 000 |
| 9 | Alsaker Fjordbruk | 25 000 | | | | | Nova Austral | 24 500 |
| 10 | Bremnes Seashore | 24 000 | | | | | Invermar | 23 200 |
| | Top 10 | 727 900 | Top 5 | 148 600 | Top 5 | 139 500 | Top 10 | 386 500 |
| | Total | 1 087 000 | Total | 156 900 | Total | 145 500 | Total | 521 200 |
| | Share of total | 67 % | Share of total | 95 % | Share of total | 96 % | Share of total | 74 % |

Note: All figures in tonnes GWT for 2017

\* UK and North American industry are best described by top 5 producers.

\*\* Cermaq is a fully owned subsidiary of Mitsubishi Corporation

The Marine Harvest Group represents the largest total production and produces around one fifth of the salmon produced in Norway, and about one third of the total produced in North America and the UK.

4.   **Atlantic Salmon Production Is Highly Inelastic And The Product Is Perishable**

71.   Mowi acknowledges that:

> Due to the long production cycle and the short shelf life of the fresh product (about 3 weeks), the spot price clears on the basis of the overall price/quantity preference of customers. As salmon is perishable and marketed fresh, all production in one period has to be consumed in the same period. In the short term, the production level is difficult and expensive to adjust as the planning/production cycle is three years long. Therefore, the supplied quantity is very inelastic in the short term, while demand also shifts according to the season. This has a large effect on the price volatility in the market.[56]

72.   Accordingly, in the absence of coordinated conduct among producers, Defendants are price-takers. They are unable to reduce supply in the short term to raise prices unilaterally, and they must sell during a very short window while their product is fit for

---

[56] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 32 (last accessed May 21, 2019).

human consumption. These market constraints make the market more susceptible to collusion than markets where goods are not perishable and production levels can be rapidly modulated.[57]

### 5.      Industry Concentration Facilitates Collusion

73.      A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

74.      Here, there has been significant (and rapid) consolidation of salmon farming operations around the globe in recent years, as Mowi reports:[58]

---

[57] *See* 2017 Mowi Annual Report, http://hugin.info/209/R/2177429/840178.pdf, at 35 ("Although the market price of salmon is established through supply and demand for the product, in the short term, salmon producers are expected to be price takers. The long production cycle and a short time window available for harvesting leave salmon farmers with limited flexibility to manage their short-term supply.") (last accessed May 21, 2019).

[58] *See*  http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 37  (last accessed May 21, 2019).

## 06     Industry Structure

### 6.2 Number of players in producing countries



The graph shows the number of players producing 80% of the farmed salmon and trout in each major producing country.

During the last decade the salmon farming industry has been through a period of consolidation in all regions and this is expected to continue.

Historically, the salmon industry has been made up by many small firms. As illustrated above, this has been the case in Norway, and to some degree in Scotland and Chile.

## II.    CLASS ACTION ALLEGATIONS

75.    Plaintiff, as specifically identified herein, also brings claims asserted in this action  on behalf of herself and as class claims under Federal Rules of civil Procedure, Rule 23(a) and (b)(3),   seeking damages pursuant to various the state antitrust, unfair competition, and consumer   protection laws of the states listed below on behalf of the following classes (the State Classes, each  of which is individually described and further defined):

(a)    **Alabama class**: All persons and entities who resided in the State of Arizona who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(b)    **Arizona class**: All persons and entities who resided in the State of Arizona who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(c)    **Arkansas class**: All persons and entities who resided in the State of Arkansas who indirectly purchased Farm-raised salmon and/or products derived therefrom for end

consumption and not for resale, produced by any Defendant or

any current or former subsidiary or affiliate

thereof, or any co-conspirator, during the Class Period.

(d)   **California class**: All persons and entities who resided in the

State of California who indirectly purchased Farm-raised

salmon and/or products derived therefrom for end

consumption and not for resale, produced by any Defendant or

any current or former subsidiary or affiliate

thereof, or any co-conspirator, during the Class Period.

(e)   **District of Columbia class**: All persons and entities who

resided in the District of Columbia who indirectly purchased

Farm-raised salmon and/or products derived therefrom for

end consumption and not for resale, produced by any

Defendant or any current or former subsidiary or affiliate

thereof, or any co-conspirator, during the Class Period.

(f)   **Florida class**: All persons and entities who resided in the

State of Florida who indirectly purchased Farm-raised salmon

and/or products derived therefrom for end consumption and

not for resale, produced by any Defendant or any current or

former subsidiary or affiliate thereof, or any co-conspirator,

during the Class Period.

(g)   **Illinois class**: All persons and entities who resided in the

State of Illinois who indirectly purchased Farm-raised salmon

31

and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(h)    **Iowa class**: All persons and entities who resided in the State of Iowa who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(i)    **Kansas class**: All persons and entities who resided in the State of Kansas who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(j)    **Maine class**: All persons and entities who resided in the State of Maine who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(k)    **Michigan class**: All persons and entities who resided in the

State of Michigan who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(l)  **Minnesota class**: All persons and entities who resided in the State of Minnesota who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(m)  **Mississippi class**: All persons and entities who resided Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(n)  **Nebraska class**: All persons and entities who resided in the State of Nebraska who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(o)  **Nevada class**: All persons and entities who resided in the

State of Nevada who who indirectly purchased Farm-raised

salmon and/or products derived therefrom for end

consumption and not for resale, produced by any Defendant or

any current or former subsidiary or affiliate thereof, or any co-

conspirator, during the Class Period.

(p) **New Hampshire class**: All persons and entities who resided

in the State of New Hampshire who indirectly purchased

Farm-raised salmon and/or products derived therefrom for

end consumption and not for resale, produced by any

Defendant or any current or former subsidiary or affiliate

thereof, or any co-conspirator,

during the Class Period.

(q) **New Mexico class**: All persons and entities who resided in

the State of New Mexico who indirectly purchased Farm-

raised salmon and/or products derived therefrom for end

consumption and not for resale, produced by any Defendant or

any current or former subsidiary or affiliate thereof, or any co-

conspirator, during the Class Period.

(r) **New York class**: All persons and entities who resided in the

State of New York who indirectly purchased Farm-raised

salmon and/or products derived therefrom for end

consumption and not for resale, produced by any Defendant

or any current or former subsidiary or affiliate thereof, or any

34

co-conspirator, during the Class Period.

(s) **North Carolina class**: All persons and entities who resided in the State of North Carolina who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(t) **North Dakota class**: All persons and entities who resided in the State of North Dakota who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period..

(u) **Oregon class**: All persons and entities who resided in the State of Oregon who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(v) **Rhode Island class**: All persons and entities who resided in the State of Rhode Island who indirectly purchased Farm-raised salmon and/or products derived therefrom for end

consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(w)   **South Carolina class**: All persons and entities who resided in the State of South Carolina who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(x)   **Tennessee class:** All persons and entities who resided in the State of Tennessee who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(y)   **Utah class**: All persons and entities who resided in the State of Utah who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(z)   **Vermont class**: All persons and entities who resided in the

State of Vermont who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(ee)   **West Virginia class**: All persons and entities who resided in the State of West Virginia who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(aa)   **Wisconsin class**: All persons and entities who resided in the State of Wisconsin who indirectly purchased Farm-raised salmon and/or products derived therefrom for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

The State Classes are collectively referred to herein as the "Classes" unless otherwise indicated.

76.   Excluded from each of the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities   of the federal government, states and their subdivisions, agencies and instrumentalities, all judges  assigned to this matter, all jurors in this matter, and all

persons and entities who only purchased Farm-raised salmon and/or products derived therefrom directly.

77.     Each of the Classes is so numerous that joinder of all members would be impracticable. While Plaintiff does not know the exact number of members of each of the Classes, Plaintiff believes there are at least thousands of members in each of the Classes.

78.     Common questions of law and fact exist as to all members of each of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all members of each of the Classes, thereby making appropriate relief with respect to each Class as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

> (a) Whether the Defendants and their co-conspirators engaged in a combination and conspiracy to fix, raise, maintain or stabilize the prices of Farm-raised salmon sold in the United States and in each of the States alleged herein;
>
> (b) The identity of the participants of the alleged conspiracy;
>
> (c) The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;
>
> (d) Whether Defendants' alleged conduct violated various state antitrust and restraint of trade laws;
>
> (e) Whether Defendants' alleged conduct violated various state consumer protection and unfair competition laws;
>
> (f) Whether the conduct of Defendants and co-conspirators, as alleged in this Complaint, caused injury to the business or

property of Plaintiffs and the members of the
Classes;

(g) The effect of Defendants' alleged conduct on
the prices of Farm-raised salmon sold in the
United States during the Class Period; and

(h) The appropriate relief for the Classes, including
injunctive and equitable relief.

79.    Plaintiff's claims are typical of the claims of the members of the
respective Classes Plaintiff seeks to represent, and Plaintiff will fairly and adequately
protect the interests of the respective classes Plaintiff seeks to represent. Plaintiff and
all members of the Classes that Plaintiff seeks to represent were similarly affected by
Defendants' wrongful conduct in that they paid artificially inflated prices for Farm-
raised salmon and/or products derived therefrom purchased indirectly from the
Defendants and/or their co-conspirators.

80.    Plaintiff's claims arise out of the same common course of conduct giving
rise to the claims of the other members of each of the Classes that each Plaintiff seeks to
represent. Plaintiff's interests are coincident with, and not antagonistic to, those of the
other members of the respective Classes that plaintiff seeks to represent. Plaintiff is
represented by counsel who are competent and experienced in the prosecution of
antitrust and class action litigation.

81.    The questions of law and fact common to the members of each of the
Classes predominate over any questions affecting only individual members, including
legal and factual issues relating to liability and damages.

82.    Class action treatment is a superior method for the fair and efficient
adjudication of the controversy, in that, among other things, such treatment will permit a

large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

83.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## III.     INTERSTATE AND INTRASTATE TRADE AND COMMERCE

84.     Hundreds of millions of dollars of transactions in farm-raised salmon and products derived therefrom are entered into each year in interstate commerce in the United States and the payments for those transactions flowed in interstate commerce.

85.     Defendants' manipulation of the market had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

86.     Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for farm-raised salmon and products derived therefrom.

87.     Defendants' unlawful conduct has a direct and adverse impact on competition in the United States. Absent Defendants' combination, conspiracy, and/or agreement to manipulate the market for farm-raised salmon and products derived

therefrom, the prices of farm-raised salmon and products derived therefrom would have been determined by a competitive, efficient market.

88.     Defendants' unlawful conduct described herein caused inflated prices for farm- raised salmon and products derived therefrom also had substantial intrastate effects.

**IV.     PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY**

89.     Defendants' antitrust conspiracy had the following effects, among others:

(a) Price competition has been restrained or eliminated with respect to the   pricing of farm-raised salmon and products derived therefrom;

(b) The prices of farm-raised salmon and products derived therefrom have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c) Plaintiff and the Classes have paid higher prices for farm-raised salmon   and products derived therefrom as a direct, foreseeable and proximate  result of Defendants' conduct;

(d) Purchasers of farm-raised salmon and products derived therefrom have   been deprived of the benefits of free and open competition; and

(e) Purchasers of farm-raised salmon and products derived therefrom paid   artificially inflated prices.

90.     The purpose of the conspiratorial and unlawful conduct of Defendants and their co- conspirators was to fix, raise, stabilize and/or maintain the price of farm-raised salmon and  products derived therefrom.

91.     The precise amount of the overcharge impacting the prices of farm-raised salmon  and products derived therefrom paid by Plaintiff and the Class can be measured and quantified  using well-accepted models.

92.     By reason of the alleged violations of the antitrust laws, Plaintiff and the

members of the Class have sustained injury to their businesses or property, having paid higher prices for farm-raised salmon and products derived therefrom than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CAUSES OF ACTION

### COUNT I
### Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) (Conspiracy in Restraint of Trade – Injunctive Relief)

93.     Plaintiff repeats the allegations set forth in paragraphs 1-92 above as if fully set forth herein.

94.     From at least July 1, 2015 until the effects of their unlawful conduct cease, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regards to farm-raised salmon and products derived therefrom in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

95.     The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially high levels the prices they charged for farm-raised salmon and products derived therefrom in the United States and elsewhere.

96.     In formulating and effectuating this conspiracy, Defendants and their co- conspirators did those things that they combined and conspired to do, including:

(a)      exchanging competitively sensitive information among themselves, with the aim to fix, increase, maintain, or stabilize prices of farm-raised salmon and products derived therefrom in the United States and elsewhere;

(b)      participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of farm-raised salmon and products derived therefrom in the United States and elsewhere;

(c)      participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

(d)      engaging in conduct designed to raise and stabilize the prices of farm-raised salmon sold on the spot market and pursuant to contracts.

97.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, raise, or stabilize prices of farm-raised salmon and products derived therefrom.

98.    Defendants' conspiracy had the following effects, among others:

(a)      Price competition in the market for farm-raised salmon and products derived therefrom has been restrained, suppressed, and/or eliminated;

(b)      Prices for farm-raised salmon and products derived therefrom provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States and elsewhere; and

(c)      Plaintiff and members of the Class who purchased farm-raised salmon and products derived therefrom from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

99.    Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for farm-raised salmon and products derived therefrom purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

100.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

101.    Plaintiff and members of the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## STATE DAMAGES CLAIMS

### COUNT II
**(Alabama Code §§ 6-5-60 et seq.)**
**(On Behalf of the Alabama Class)**

102.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

103.    By reason of the conduct alleged herein, Defendants violated Alabama Code §§ 6- 5-60 et seq.

104.    Title 6 of the Alabama Code regulates civil practice. Chapter 5 Article 5 thereof generally prohibits unlawful trusts, combines, or monopolies. Alabama Code §§ 6-5-60 et seq.

105.    Alabama Class members purchased farm-raised salmon and/or products derived therefrom within the State of Alabama during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would have been lower.

106.    Under Alabama law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Alabama Code based on the facts alleged in

44

this Complaint. Alabama  Code §§ 6-5-60 et seq.

107.    Defendants combined, contracted, understood and agreed in the market for farm- raised salmon and/or products derived therefrom in an unlawful manner, with the effect of  restraining trade, increasing the price of farm-raised salmon and/or products derived therefrom and  hindering competition in the sale of farm-raised salmon and/or products derived therefrom, in  violation of Alabama Code §§ 6-5-60 et seq.

108.    Defendants' farm-raised salmon and/or products derived therefrom were sold  throughout the State of Alabama. During the Class Period, Defendants' illegal conduct  substantially affected Alabama commerce.

109.    Members of the Alabama Class were injured and are threatened with injury with respect to purchases of farm-raised salmon and/or products derived therefrom in Alabama in that  they paid and will pay supra- competitive prices for farm-raised salmon and/or products derived  therefrom due to Defendants' unlawful conduct, and are entitled to all forms of relief available  under Alabama Code §§ 6-5-60 et seq.

### COUNT III
**(Arizona Rev. Stat. §§ 44-
1401 et seq.) (On Behalf of
the Arizona Class)**

110.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

111.    By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. § 44-1401, et seq.

112.    Arizona Class members purchased farm-raised salmon and/or products derived  therefrom within the State of Arizona during the Class Period. But for Defendants' conduct set  forth herein, the price of farm-raised salmon and/or products

derived therefrom would have been  lower.

113.    Defendants  entered  into  a  contract,  combination,  or  conspiracy between  two  or   more persons in restraint of trade or commerce in the  farm-raised salmon and/or products derived  therefrom market, a substantial part of which occurred within Arizona.

114.    Defendants' violations of Arizona law were flagrant.

115.    Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

116.    As  a  direct  and  proximate  result  of  Defendants'  unlawful  conduct, members of the   Arizona Class have been injured in their business or property and are threatened with further injury   in that they paid and will pay supra-competitive prices for farm-raised salmon and/or products  derived therefrom due to Defendants' unlawful conduct.

117.    By reason of the foregoing, members of the Arizona Class are entitled to seek all  forms of relief available under Arizona Revised Stat. § 44-1401, et seq.

## COUNT IV
### (Ark. Code Ann. § 4-88-101, *et seq.*)
#### (On Behalf of the Arkansas Class)

118.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

119.    By reason of the conduct alleged herein, Defendants have violated Arkansas Code Ann. § 4-88-101, et seq.

120.    Arkansas Class members purchased farm-raised salmon and/or products derived therefrom within the State of Arizona during the Class Period. But for

Defendants' conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would have been lower.

121.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the farm-raised salmon and/or products derived therefrom market, a substantial part of which occurred within Arkansas.

122.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Arkansas.

123.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiff and members of the Class.

124.    Defendants' unlawful conduct substantially affected Arkansas's trade and commerce.

125.    Defendants' conduct was willful.

126.    As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Arkansas Class have been injured in their business or property and are threatened with further injury.

127.    By reason of the foregoing, Plaintiffs and members of the Arkansas Class are entitled to seek all forms of relief, including actual damages plus reasonable attorney's fees under Ark. Code Ann. § 4-88-113.

<u>**COUNT V**</u>
**(California Business and Professions Code §§**
**16720, 16750)  (On Behalf of the California Class)**

128.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

129.    By reason of the conduct alleged herein, Defendants have violated California

Bus. & Prof. Code §§ 16700, et seq. and California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.

130.    California Class members purchased farm-raised salmon and/or products derived therefrom within the State of California during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would have been lower.

131.    Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce as alleged herein in violation of California Bus. & Prof. Code §§ 16700, 16720, et seq. In order to maintain the price of farm-raised salmon and/or products derived therefrom at supra-competitive levels at the California Class's expense, Defendants have combined and conspired to restrain and exclude competition in the Relevant Market.

132.    Defendants' anticompetitive conduct was knowing and willful and constitutes a flagrant violation of Section §§ 16700, et seq.

133.    There is no pro-competitive justification for this anticompetitive conduct that outweighs its anticompetitive effects. Any possible pro-competitive benefits for such conduct could have been obtained by less restrictive alternatives.

134.    Defendants' anticompetitive conduct injured, and continues to injure members of the California Class in their business or property in that they paid and will pay supra-competitive prices for farm-raised salmon and/or products derived therefrom due to Defendants' anticompetitive conduct.

135.    Injury to members of the California Class was a direct, foreseeable, and proximate result of Defendants' anticompetitive conduct.

136.    As a result of Defendants' violation of Section 16700, et seq., the California Class   seeks treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section   16750(a).

### COUNT VI
### (District of Columbia Code Ann. §§ 28-4501 et seq.) (On Behalf of the District of Columbia Class)

137.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

138.    The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of  Columbia by prohibiting restraints of trade and monopolistic practices."

139.    District of Columbia Class members purchased farm-raised salmon and/or products  derived therefrom within the District of Columbia during the Class Period. But for Defendants'  conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would  have been lower.

140.    Under District of Columbia law, indirect purchasers have standing to maintain an  action under the antitrust provisions of the District of Columbia Code based on the facts alleged  in this Complaint, because "any indirect purchaser in the chain of manufacture, production or  distribution of goods . . . shall be deemed to be injured within the meaning of this chapter." D.C.  Code 28-4509(a).

141.    Defendants contracted, combined or conspired to act in restraint of trade within the  District of Columbia, in violation of D.C. Code § 28-4501, et seq.

142.    Members of the District of Columbia Class were injured and are threatened with  further injury with respect to purchases of farm-raised salmon and/or

49

products derived therefrom   in the District of Columbia in that they paid and will pay supra-competitive prices for farm-raised  salmon and/or products derived therefrom due to Defendants' unlawful conduct, and are entitled  to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys'  fees and costs.

**COUNT VII**
**(Florida Stat. § 501.201(2)**, *et seq.***)**
**(On Behalf of the Florida Class)**

143.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

144.    The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the  "FDUTPA"),   generally   prohibits   "unfair   methods   of competition, unconscionable  acts  or  practices,  and  unfair  or  deceptive  acts  or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

145.    The primary policy of the FDUTPA is "[t]o protect the consuming public  and legitimate  business  enterprises  from  those  who  engage  in  unfair methods of competition, or  unconscionable,  deceptive,  or  unfair  acts  or  practices  in  the  conduct of any trade or commerce." Florida Stat. § 501.202(2).

146.    A  claim  for  damages  under  the  FDUTPA  has  three  elements:  (1)  a prohibited practice; (2) causation; and (3) actual damages.

147.     Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a)  (". . . anyone  aggrieved  by  a  violation  of  this  [statute]  may  bring  an action . . .").

148.    Florida class members purchased  f arm-raised salmon and/or products derived therefrom within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would

50

have been lower.

149.    Defendants contracted, combined or conspired to restrain trade in the market for farm-raised salmon and/or products derived therefrom, a substantial part of which occurred in Florida. for the purpose of excluding competition or controlling, fixing or maintaining prices for farm-raised salmon and/or products derived therefrom, in violation of Fla. Stat. §§ 501.201, *et seq.*

150.    Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

151.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Florida Class have been injured in their business or property by virtue of overcharges for farm-raised salmon and/or products derived therefrom and are threatened with further injury.

152.    By reason of the foregoing, Plaintiffs and the members of the Florida Class are entitled to seek all forms of relief, including injunctive relief pursuant to Fla. Stat. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

## COUNT VIII
### (740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*)
### (On Behalf of the Illinois Class)

153.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

154.    The Illinois Antitrust Act, 740 ILCS 10/1, et seq., aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which

act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 Ill. Comp. Stat. 10/2.

155.    Illinois Class members purchased farm-raised salmon and/or products derived therefrom within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would have been lower

156.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 Ill. Comp. Stat. 10/7(2).

157.    Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for farm-raised salmon and/or products derived therefrom sold, and/or for allocating customers or markets for farm-raised salmon and/or products derived therefrom within the intrastate commerce of Illinois.

158.    Defendants further unreasonably restrained trade or commerce an established, maintained or attempted to acquire monopoly power over the market for farm-raised salmon and products derived therefrom in Illinois for the purpose of excluding competition, in violation of 740 Ill. Comp. Stat. 10/1, et seq.

159.    Members of the Illinois Class were injured with respect to purchases of farm-raised salmon and/or products derived therefrom in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

**COUNT IX**
**(Iowa Code §§**
**553.1 et seq.) (On**
**Behalf of the Iowa**
**Class)**

160.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

161.    The Iowa Competition Law aims to "prohibit[] restraint of economic activity and  monopolistic practices." Iowa Code § 553.2.

162.    Iowa Class members purchased farm-raised salmon and/or products derived  therefrom within the State of Iowa during the Class Period. But for Defendants' conduct set forth   herein, the price of farm-raised salmon and/or products derived therefrom would have been lower.

163.    Defendants contracted, combined or conspired to restrain trade in the market for  farm-raised salmon and/or products derived therefrom, a substantial part of which occurred in  Iowa, for the purpose of excluding competition or controlling, fixing or maintaining prices for  farm-raised salmon and/or products derived therefrom, in violation of Iowa Code § 553.1, et seq.

164.    Defendants' violations of Iowa law were willful or flagrant.

165.    Defendants' unlawful conduct substantially affected Iowa's trade and commerce.

166.    Members of the Iowa Class were injured and are threatened with further injury with respect to purchases of farm-raised salmon and/or products derived therefrom in Iowa in that they   paid  and  will  pay  supra-competitive  prices  for  farm-raised salmon and/or products derived  therefrom due to Defendants' unlawful conduct, and are entitled to all forms of relief, including   actual damages, exemplary damages for

willful conduct, reasonable attorneys' fees and costs, and  injunctive relief.

## COUNT X
### (Kansas Stat. Ann §§ 50-101
### et seq.)  (On Behalf of the
### Kansas Class)

167.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

168.    The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend  to prevent full and free competition in the importation, transportation or sale of articles imported  into this state." Kan. Stat. Ann. § 50-112.

169.    Kansas Class members purchased farm-raised salmon and/or products derived  therefrom within the State of Kansas during the Class Period. But for Defendants' conduct set  forth herein, the price of farm-raised salmon and/or products derived therefrom would have been  lower.

170.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing  to  maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

171.    Defendants combined capital, skill or acts for the purposes of creating restrictions  in trade or commerce of farm-raised salmon and/or products derived therefrom,  increasing the  price of farm-raised salmon and/or products derived therefrom, preventing competition in the sale  of farm-raised salmon and/or products derived therefrom, or binding themselves not to sell farm-  raised salmon and/or products derived therefrom, in a manner that established the price of farm-  raised salmon and/or products derived therefrom and precluded free and unrestricted competition among themselves in the sale of farm-raised salmon and/or products derived  therefrom,  in  violation of Kan. Stat. Ann. § 50-101, et seq.

172.    Defendants' unlawful conduct substantially affected Kansas's trade and commerce.

173.    Members of the Kansas Class were injured and will continue to be injured with respect to purchases of farm-raised salmon and/or products derived therefrom in Kansas in that they paid and will pay supra- competitive prices for farm-raised salmon and/or products derived therefrom due to Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**COUNT XI**
**(Me. Rev. Stat. Ann. tit. 10 § 1101, et seq.)**
**(On Behalf of the Maine Class)**

174.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

175.    Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.

176.    Maine Class members purchased farm-raised salmon and/or products derived therefrom within the State of Maine during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would have been lower.

177.    Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

178.    Defendants contracted, combined or conspired in restraint of trade or

commerce of farm-raised salmon and/or products derived therefrom within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of farm-raised salmon and/or products derived therefrom within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 4, § 1101, *et seq.*

179.    Members of the Maine Class were injured with respect to purchases of farm-raised salmon and/or products derived therefrom in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

### COUNT XII
### (Michigan Compiled Laws Ann. §§ 445.771 et seq.)  (On Behalf of the Michigan Class)

180.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

181.    The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and   conspiracies in restraint of trade or commerce…[and] to provide remedies, fines, and penalties for   violations of this act." Mich. Act 274 of 1984.

182.    Michigan Class members purchased farm-raised salmon and/or products derived   therefrom within the State of Michigan during the Class Period. But for Defendants' conduct set   forth herein, the price of farm-raised salmon and/or products derived therefrom would have been   lower.

183.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to  maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

184.    Defendants contracted, combined, or conspired, a substantial part of which occurred   in Michigan, to restrain trade or commerce in the market for farm-raised

salmon and/or products derived therefrom, in violation of Mich. Comp. Laws § 445.772, et seq.

185.   Defendants' unlawful conduct substantially affected Michigan's trade and commerce.

186.   Members of the Michigan Class were injured and are threatened with injury with respect to purchases of farm-raised salmon and/or products derived therefrom in Michigan in that they paid and will pay supra- competitive prices for farm-raised salmon and/or products derived therefrom due to Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## COUNT XIII
### (Minnesota Ann. Stat. §§ 325D.49 et seq.) (On Behalf of the Minnesota Class)

187.   The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

188.   The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; whenever any of these affect Minnesota trade or commerce.

189.   Minnesota Class members purchased farm-raised salmon and/or products derived therefrom within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would have been lower.

190.   Under the Minnesota Antitrust Act of 1971, indirect purchasers have

standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

191.        Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for farm-raised salmon and/or products derived therefrom within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for farm- raised salmon and/or products derived therefrom within the intrastate commerce of and outside of Minnesota; in violation of Minn. Stat. § 325D.49, et seq.

192.    Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

193.    As a direct and proximate result of Defendants' unlawful conduct, the members of the Minnesota Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for farm-raised salmon and/or products derived therefrom due to Defendants' unlawful conduct

194.    By reason of the foregoing, the Minnesota Class is entitled to seek all forms of relief available under Minnesota Stat. §§ 325D.49, et seq.

**COUNT XIV**
**(Mississippi Code Ann. §§ 75-21-1**
**et seq.) (On Behalf of the**
**Mississippi Class)**

195.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

196.    Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or

hindrance of trade, with   the aim that "trusts and combines may be suppressed, and the benefits arising from competition in   business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

197.   Mississippi Class members purchased farm-raised salmon and/or products derived   therefrom within the State of Mississippi during the Class Period. But for Defendants' conduct set   forth herein, the price of farm-raised salmon and/or products derived therefrom would have been   lower.

198.   Trusts are combinations, contracts, understandings or agreements, express or   implied, when inimical to the public welfare and with the effect of, inter alia, restraining trade,   increasing the price or output of a commodity, or hindering competition in the production or sale   of a commodity. Miss. Code Ann. § 75-21-1.

199.   Under Mississippi law, indirect purchasers have standing to maintain an   action   under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint.  Miss. Code Ann. § 75-21-9.

200.   Defendants combined, contracted, understood and agreed in the market for farm-raised salmon and/or products derived therefrom in a manner inimical to public welfare, with the  effect of restraining trade, increasing the price of farm-raised salmon and/or products derived   therefrom and hindering competition in the sale of farm-raised salmon and/or products derived   therefrom, in violation of Miss. Code Ann. § 75-21-1(a), et seq. 270.

201.   Defendants' farm-raised salmon and/or products derived therefrom sold in stores   throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct   substantially affected Mississippi commerce.

202.    Members of the Mississippi Class were injured and are threatened with injury with respect to purchases of farm-raised salmon and/or products derived therefrom in Mississippi in that they paid and will pay supra-competitive prices for farm-raised salmon and/or products derived therefrom due to Defendants' unlawful conduct, and are entitled to all forms of relief available under Miss. Code Ann. § 75-21-21, et seq.

**COUNT XV**
**(Nebraska Rev. Stat. §§ 59-801 et seq.) (On Behalf of the Nebraska Class)**

203.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

204.    Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade.

205.    Nebraska Class members purchased farm-raised salmon and/or products derived therefrom within the State of Nebraska during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would have been lower.

206.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

207.    Defendants contracted, combined or conspired in restraint of trade or commerce of farm-raised salmon and/or products derived therefrom within the intrastate commerce of Nebraska, through agreements to fix prices, and otherwise control trade, in violation of Neb. Rev. Stat. § 59- 801, et seq.

208.    Defendants' unlawful conduct substantially affected Nebraska's trade and  commerce.

209.    Members of the Nebraska Class were injured and will continue to be injured with  respect to purchases of farm-raised salmon and/or products derived therefrom in Nebraska in that  they paid and will pay supra- competitive prices for farm-raised salmon and/or products derived  therefrom due to Defendants' unlawful conduct, and are entitled to all forms of relief, including  actual damages or liquidated damages in an amount which bears a reasonable relation to the actual  damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive  relief.

**COUNT XVI**
**(Nevada Rev. Stat. Ann. §§**
**598A.010 et seq.)  (On Behalf of the**
**Nevada Class)**

210.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

211.    The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open  and  competitive production and sale of commodities…is necessary to the economic well-being of the   citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

212.    Nevada Class members purchased farm-raised salmon and/or products derived  therefrom within the State of Nevada during the Class Period. But for Defendants' conduct set  forth herein, the price of farm-raised salmon and/or products derived therefrom would have been  lower.

213.    The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to  preserve and protect the free, open and competitive market, and to penalize

61

all persons engaged in   anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, inter alia, price  fixing, and division of markets. Nev. Rev. Stat. Ann. § 598A.060.

214.    Under Nevada law, indirect purchasers have standing to maintain an action under  NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

215.    Defendants fixed prices by agreeing to establish prices for farm-raised salmon   and/or products derived therefrom in Nevada, and within the intrastate commerce of Nevada,  constituting a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev.  Stat. Ann. § 598A, et seq.

216.    Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

217.    Members of the Nevada Class were injured and are threatened with injury with   respect to purchases of farm-raised salmon and/or products derived therefrom in Nevada in that at least thousands of sales of Defendants' farm-raised salmon and/or products derived therefrom took   place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by  Defendants' conduct.

218.    Accordingly, members of the Nevada Class are entitled to all forms of  relief,  including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## COUNT XVII
**(New Hampshire Rev. Stat. §§
356:1 et seq.) (On Behalf of the
New Hampshire Class)**

219.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

220.    Title XXXI of the New Hampshire Statutes generally governs trade and commerce.  Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H.  Rev. Stat. Ann. §§ 356:2, 3.

221.    New Hampshire Class members purchased farm-raised salmon and/or products   derived therefrom within the State of New Hampshire during the Class Period. But for Defendants'   conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would  have been lower.

222.    Under New Hampshire law, indirect purchasers have standing to maintain an action  based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

223.    Defendants fixed, controlled or maintained prices for farm-raised salmon  and/or   products derived therefrom, constituting a contract, combination or conspiracy in restraint of trade,   a substantial part of which occurred in New Hampshire, in violation of N.H. Rev. Stat. Ann. §  356:1, et seq.

224.    Members of the New Hampshire Class were injured and are threatened with injury  with respect to purchases of farm-raised salmon and/or products derived therefrom  in  New Hampshire in that they paid more and will continue to pay more for farm-raised salmon and/or  products derived therefrom than they otherwise would in the absence of Defendants' unlawful   conduct, and are entitled to all forms of relief, including actual damages sustained, treble damages   for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

**COUNT XVIII**
**(New Mexico Stat. Ann. §§ 57-1-1**
**et seq.) (On Behalf of the New**
**Mexico Class)**

225.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

226.    The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. 57-1-15.

227.    New Mexico Class members purchased farm-raised salmon and/or products derived therefrom within the State of New Mexico during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would have been lower.

228.    Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.

229.    Defendants contracted, agreed, combined or conspired to restrain trade for farm- raised salmon and/or products derived therefrom within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, et seq.

230.    Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

231.    Members of the New Mexico Class were injured and will continue to be injured with respect to purchases of farm-raised salmon and/or products derived therefrom in New Mexico in that they paid more and will continue to pay more for farm-raised salmon and/or products derived therefrom than they otherwise would in the absence of Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## COUNT XIX
### (The Donnelly Act, New York General Bus. Law §§ 340 et seq.) (On Behalf of the New York Class)

232.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

233.    Article 22 of the New York General Business Law general prohibits monopolies  and contracts or agreements in restraint of trade, with the policy of encouraging competition or the  free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y.  Gen. Bus. Law § 340(1).

234.    New York Class members purchased farm-raised salmon and/or products derived  therefrom within the State of New York during the Class Period. But for Defendants' conduct set  forth herein, the price of farm-raised salmon and/or products derived therefrom would have been  lower.

235.    Under New York law, indirect purchasers have standing to maintain an action based  on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

236.    Defendants restrained competition in the free exercise of the conduct of the business  of farm-raised salmon and/or products derived therefrom within the intrastate commerce of New  York, in violation of N.Y. Gen. Bus. Law § 340, et seq.

237.    Defendants' unlawful conduct substantially affected New York's trade and  commerce.

238.    Members of the New York Class were injured and are threatened with further injury  with respect to purchases of farm-raised salmon and/or products derived therefrom in New York in  that they paid more and will continue to pay more for farm-raised salmon and/or products  derived therefrom than they otherwise would in the absence of Defendants' unlawful conduct, and  are entitled to all forms of relief,

including actual damages, treble damages, costs not exceeding $10,000, and reasonable

attorneys' fees.

## COUNT XX
### (North Carolina General Stat. §§
### 75-1 et seq.) (On Behalf of the
### North Carolina Class)

239.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

240.     By reason of the conduct alleged herein, Defendants have violated N.C. Gen.

Stat. § 75-1.1, et seq.

241.    North Carolina class members purchased farm-raised salmon and/or

products  derived therefrom within the State of North Carolina during the Class Period.

But for Defendants'   conduct set forth herein, the price of farm-raised salmon and/or

products derived therefrom would  have been lower.

242.    Defendants entered into a contract or combination in the form of trust or

otherwise,  or conspiracy in restraint of trade or commerce in the farm-raised salmon

and/or products derived  therefrom market, a substantial part of which occurred within

North Carolina.

243.    Defendants' conduct was unfair, unconscionable, or deceptive within the

conduct  of commerce within the State of North Carolina.

244.    Defendants  trade  practices  are  and  have  been  immoral,  unethical,

unscrupulous, and  substantially injurious to consumers.

245.    Defendants'  conduct  misled  consumers,  withheld  material  facts,  and

resulted in  material misrepresentations to members of the North Carolina class.

246.    Defendants'  unlawful  conduct  substantially  affected  North  Carolina's

66

trade and commerce.

247.    As a direct and proximate result of Defendants' unlawful conduct, members of the  North Carolina Class have been injured in their business or property and are threatened with further  injury in that they paid more and will continue to pay more for farm-raised salmon and/or products  derived therefrom than they otherwise would in the absence of Defendants' unlawful conduct.

248.    By reason of the foregoing, members of the North Carolina Class are entitled to  seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, et seq.

## COUNT XXI
### (North Dakota Century Code §§ 51-08.1-01 et seq.)  (On Behalf of the North Dakota Class)

249.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

250.    The North Dakota Uniform State Antitrust Act generally prohibits restraints on or  monopolization of trade. N.D. Cent. Code § 51-08.1, et seq.

251.    North Dakota class members purchased farm-raised salmon and/or products derived  therefrom within the State of North Dakota during the Class Period. But for Defendants' conduct  set forth herein, the price of farm-raised salmon and/or products derived therefrom would have  been lower.

252.    Under the North Dakota Uniform State Antitrust Act, indirect purchasers have  standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-  08.1-08.

253.    Defendants contracted, combined or conspired in restraint of in the market for farm-  raised salmon and/or products derived therefrom, a substantial part of which

occurred within North  Dakota, for the purposes of excluding competition or controlling, fixing or maintaining prices for  farm-raised salmon and/or products derived therefrom, in violation of N.D. Cent. Code §§ 51-08.1-02, 03.

254.    Defendants' violations of North Dakota law were flagrant.

255.    Defendants' unlawful conduct  substantially affected  North Dakota's trade  and  commerce.

256.    Members of the North Dakota Class were injured and will continue to be  injured  with respect to purchases in North Dakota in that they paid more and will continue to pay more for  farm-raised salmon and/or products  derived  therefrom than they otherwise would in the absence  of Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages,  treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other  equitable relief.

## COUNT XXII
### (Oregon Revised Statutes
### §§ 646.705 et seq.)  (On Behalf of
### the Oregon Class)

257.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

258.    Chapter 646 of the Oregon Revised Statutes generally governs business and trade  practices within Oregon. Sections 705 through 899 thereof govern antitrust violations, with the  policy to "encourage free and open competition in the interest of the general welfare and economy  of the state." Or. Rev. Stat. § 646.715.

259.    Oregon Class members purchased farm-raised salmon and/or products derived  therefrom  within  the  State  of  Oregon  during  the  Class  Period.  But  for Defendants' conduct set  forth herein, the price of farm-raised salmon and/or products derived therefrom would have been  lower.

68

260.    Under Oregon law, indirect purchasers have standing under the antitrust provisions   of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint.  Or. Rev. Stat. § 646.780(1)(a).

261.    Defendants contracted, combined, or conspired in restraint of trade or commerce of  farm-raised salmon and/or products derived therefrom, a substantial part of which occurred within   Oregon, in violation of Or. Rev. Stat. § 646.705, et seq.

262.    Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

263.    Members of the Oregon Class were injured with respect to purchases of farm-raised  salmon and/or products derived therefrom within the intrastate commerce of Oregon, or  alternatively to interstate commerce involving actual or threatened injury to persons located in  Oregon, in that they paid more and will continue to pay more for farm-raised salmon and/or  products derived therefrom than they otherwise would in the absence of Defendants' unlawful  conduct.

264.    Members of the Oregon Class are entitled to all forms of relief, including actual  damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs,   and injunctive relief.

**COUNT XXIII**
**(Rhode Island Antitrust Act, Rhode Island Gen. Law §§ 6-36-1 et seq.)  (On Behalf of the Rhode Island Class)**

265.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

266.    The  Rhode  Island  Antitrust  Act  aims  to  promote  the  unhampered growth  of  commerce  and  industry  throughout  Rhode  Island  by  prohibiting unreasonable restraints of trade  that hamper, prevent or decrease competition. R.I. Gen.

Laws § 6-36- 2(a)(2).

267.    Rhode Island Class members purchased farm-raised salmon and/or products derived therefrom within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would have been lower.

268.    Under the Rhode Island Antitrust Act, as of July 15, 2013, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6- 36-11(a).

269.    Defendants contracted, combined and conspired in restraint of trade of farm-raised salmon and/or products derived therefrom within the intrastate commerce of Rhode Island, for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, et seq.

270.    Members of the Rhode Island Class were injured and will continue to be injured with respect to purchases of farm-raised salmon and/or products derived therefrom in Rhode Island in that they paid more and will continue to pay more for farm-raised salmon and/or products derived therefrom than they otherwise would in the absence of Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

### COUNT XXIV
**(South Dakota Codified Laws §§ 37-1-
3.1 et seq.) (On Behalf of the South
Dakota Class)**

271.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

272.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. Codified Laws §§ 37-1-3.1, 3.2.

273.    South Dakota Class members purchased farm-raised salmon and/or products derived therefrom within the State of South Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would have been lower.

274.    Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

275.    Defendants contracted, combined or conspired in restraint of trade or commerce of farm-raised salmon and/or products derived therefrom within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1, et seq.

276.    Defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

277.    Members of the South Dakota Class were injured and will continue to be injured with respect to purchases of farm-raised salmon and/or products derived therefrom in South Dakota in that they paid more and will continue to pay more for farm-raised salmon and/or products derived therefrom than they otherwise would in the absence of Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## COUNT XXV
### (Tennessee Code Ann. §§ 47-25-101 et seq.) (On Behalf of the Tennessee Class)

278.   The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

279.   By reason of the conduct alleged herein, Defendants have violated Tennessee Code  Ann. §§ 47-25 101, et seq.

280.   Tennessee Class members purchased farm-raised salmon and/or products derived  therefrom within the State of Tennessee during the Class Period. But for Defendants' conduct set  forth herein, the price of farm-raised salmon and/or products derived therefrom would have been  lower.

281.   Defendants have entered into arrangements, contracts, agreements, trusts, or  combinations with persons or corporations designed to, or which tend to, advance or control the  price or the cost to end users in the farm-raised salmon and/or products derived therefrom market  throughout Tennessee.

282.   Defendants' unlawful conduct affects Tennessee commerce to a substantial degree  by causing Tennessee consumers to pay inflated prices for farm-raised salmon and/or products  derived therefrom.

283.   As a direct and proximate cause of Defendants' unlawful conduct, members of the  Tennessee Class have been injured in their business or property and are threatened with further  injury in that they paid more and will continue to pay more for farm-raised salmon and/or products  derived therefrom than they otherwise would in the absence of Defendants' unlawful conduct.

284.   By reason of the foregoing, members of the Tennessee Class are entitled to seek all  forms of relief available under Tennessee Code Ann. §§ 47-25-101, et seq.

## COUNT XXVI
### (Utah Code Ann. §§ 76-10-3101 et seq.) (On Behalf of the Utah Class)

285.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

286.    The Utah Antitrust Act aims to "encourage free and open competition in the interest  of the general welfare and economy of this state by prohibiting monopolistic and unfair trade  practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

287.    Utah Class members purchased farm-raised salmon and/or products derived  therefrom within the State of Utah during the Class Period. But for Defendants' conduct set forth  herein, the price of farm-raised salmon and/or products derived therefrom would have been lower.

288.    Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or  Utah citizens have standing to maintain an action based on the facts alleged in this Complaint.  Utah Code Ann. § 76-10-3109(1)(a).

289.    Defendants contracted, combined or conspired in restraint of trade or commerce of  farm-raised salmon and/or products derived therefrom, in violation of Utah Code Ann. § 76-10-  3101, et seq.

290.    Members of the Utah Class who are either Utah residents or Utah citizens were  injured and will continue to be injured with respect to purchases of farm-raised salmon and/or  products derived therefrom in Utah in that they paid more and will continue to pay more for farm-  raised salmon and/or products derived therefrom than they otherwise would in the absence of  Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages,  treble damages, costs

of suit, reasonable attorneys' fees, and injunctive relief.

## COUNT XXVII
### (Vermont Stat. Ann. §§ 2453
### et seq.) (On Behalf of the
### Vermont Class)

291.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

292.    By reason of the conduct alleged herein, Defendants have violated the Vermont  Statutes Annotated.

293.    Vermont Class members purchased farm-raised salmon and/or products derived  therefrom within the State of Vermont during the Class Period. But for Defendants' conduct set  forth herein, the price of farm-raised salmon and/or products derived therefrom would have been  lower.

294.    Defendants' conduct has and had anticompetitive effects in the farm-raised salmon  and/or products derived therefrom market, as supra-competitive prices for farm-raised  salmon and/or products derived therefrom are passed on to end users.

295.    Defendants' unlawful conduct substantially  affected Vermont's trade and  commerce.

296.    As a direct and proximate result of Defendants' unlawful conduct, members of the  Vermont Class have been injured in their business or property and are threatened with further  injury in that they paid and will continue to pay more for farm-raised salmon and/or products  derived therefrom than they otherwise would in the absence of Defendants' unlawful conduct.

297.    By reason of the foregoing, members of the Vermont Class are entitled to seek all  forms of relief available under Vermont Stat. Ann. 9 § 2453 et seq.

**COUNT XXVIII**
**(West Virginia Code §§ 47-**
**18-1 et seq.) (On Behalf of**
**the West Virginia Class)**

298.   The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

299.   The violations of federal antitrust law set forth above also constitute violations of  section 47-18-1 of the West Virginia Code.

300.   West Virginia Class members purchased farm-raised salmon and/or products  derived therefrom within the State of West Virginia during the Class Period. But for Defendants'  conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would  have been lower.

301.   During the Class Period, Defendants engaged in a continuing contract, combination  or conspiracy, a substantial part of which occurred in West Virginia, with wholesalers in  unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in   violation of W. Va. Code § 47-18-1, et seq.

302.   Defendants' anticompetitive acts described above were  knowing,  willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

303.   Defendants' unlawful conduct substantially affected West Virginia's trade  and  commerce.

304.   As a direct and proximate result of Defendants' unlawful conduct, members of the  West Virginia Class have been injured in their business and property in that they paid more for  farm-raised salmon and/or products derived therefrom than they otherwise would have paid in the   absence of Defendants' unlawful conduct.

305.   As a result of Defendants' violation of Section 47-18-3 of the West Virginia  Antitrust Act, members of the West Virginia Class seek treble damages and

their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

**COUNT XXIX**
**(Wisconsin Stat. §§**
**133.01 et seq.) (On**
**Behalf of the Wisconsin**
**Class)**

306.    The allegations in paragraphs 1-101 are incorporated as if fully stated herein.

307.    Wisconsin Class members purchased farm-raised salmon and/or products derived therefrom within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon and/or products derived therefrom would have been lower.

308.    Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(a).

309.    Defendants contracted, combined or conspired in restraint of trade or commerce of farm-raised salmon and/or products derived therefrom, a substantial part of which occurred within Wisconsin, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, et seq.

310.    Members of the Wisconsin Class were injured with respect to purchases of farm- raised salmon and/or products derived therefrom in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with consumers in Wisconsin paying substantially higher prices for Defendants' farm-raised salmon and/or products derived therefrom in Wisconsin.

311.    Accordingly, members of the Wisconsin Class are entitled to all forms

76

of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff individually and as a member of the proposed Federal Injunctive Class and the State Classes pray that:

A.       The Court determine that each of the claims alleged in this Complaint may be maintained as a class action claims under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes once certified;

B.       This Court find that Defendants' conduct constitutes violations of the Sherman Act, 15 U.S.C. §§ 1, 2 and the Clayton Act, 15 U.S.C. § 14;

C.       This Court award injunctive relief to the proposed injunctive Class under Section 16 of the Clayton Act, 15 U.S.C. § 26;

D.       The unlawful conduct alleged herein be adjudged and decreed in violation of the listed state antitrust laws, state consumer protection laws, and common law;

E.       Plaintiff and the members of the Classes recover damages, to the maximum extent allowed under applicable state law, and that a joint and several judgment in favor of Plaintiffs and the members of such Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

F.       Plaintiff and the members of the Classes recover reasonable attorneys' fees and costs as allowed by law;

G.      Plaintiff and the members of the Classes recover pre-judgment and post-judgment interest at the highest rate allowed by law; and

H.      Plaintiff and the members of the Classes be granted such other and further relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable as of right.

Dated: June 11, 2019.

<u>Richard L. O'Meara</u>
Richard L. O'Meara
MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME 04104-5085
Tel:  (207) 773-5651
romeara@mpmlaw.com

Irwin B. Levin
Richard E. Shevitz
Scott D. Gilchrist
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel:  (317) 636-6481
Fax:  (317) 636-2593
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
sgilchrist@cohenandmalad.com

Benjamin J. Widlanski
Tal J. Lifshitz
KOZYAK TROPIN &
  THROCKMORTON
2525 Ponce de Leon Blvd., 9th Floor
Miami, FL 33134
Tel: 305-372-1800
Fax: 305-372-3508
bwidlanski@kttlaw.com
tjl@kttlaw.com

*Counsel for the Plaintiff*